WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Anas Mamoun Al Zoubani,<br><br>Defendant. | No. CR-21-01111-001-TUC-SHR (LAB)<br><br>**Order Adopting Magistrate Judge's Report and Recommendation** |

Pending before the Court is a Report and Recommendation ("R&R") (Doc. 58) issued by United States Magistrate Judge Leslie A. Bowman recommending the Court deny Defendant's Motion to Suppress Evidence (Doc. 30). Defendant has filed an Objection (Doc. 66). For the reasons below, the Objections are rejected and the R&R is adopted.

**I.      Standard of Review**

When reviewing a magistrate judge's R&R, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original). However, Objections to R&Rs "are not to be construed as a second opportunity to present the arguments already considered by the Magistrate Judge." *Betancourt v. Ace Ins. Co. of Puerto Rico*, 313 F. Supp. 2d 32, 34 (D.P.R. 2004); *see also Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("The

purpose of the Federal Magistrates Act is to relieve courts of unnecessary work" and "[t]here is no increase in efficiency, and much extra work, when a party attempts to relitigate every argument which it presented to the Magistrate Judge.").

## II. Background

The Court adopts the following unobjected-to facts as set forth in the R&R:

> ***Brian S. Campbell*** testified that he has been a USBP agent for approximately 13 years. (RT 18:22, 24.)[1] He works in the intelligence unit at the Willcox station. (RT 19:17) His unit gathers information related to alien smuggling activities. (RT 20-21:24-25, 1) That information is disseminated to the field and other stations. (RT 21:3)
>
> Agent Campbell took part in this investigation on 5/5/21. (RT 21:7-9) He was working at his computer when he received an automated email alert from the license plate reader system. (RT 21:18-19) The alert stated that a blue BMW with a particular Arizona license plate number was seen in the past trying to load up with suspected undocumented people. (RT 21:20-22) Agent Campbell relayed the information to the people in the radio room, including the time of the license plate hit, the vehicle description, the license plate number, the direction of travel, and the location. (RT 21:24-25; 27:5-12) The license plate reader was located on State Route (SR) 80, north of Tombstone and was focused on traffic heading northbound toward I-10. (RT 26:14-20) The information was broadcast over the radio within a few minutes. (RT 27:16-21)
>
> The license plate reader sends an alert if a specific license plate number was previously entered into the system. (RT 28:15-19) In this case, the previous entry was made on 3/2021 when an off-duty corrections officer (CO) observed the vehicle involved in suspicious activity near Douglas. (RT 28-29:21-23, 3-5); (RT 29:8-9) The CO saw people run up to the car and then run back into the desert before the car took off. (RT 29:10-11) The CO described the vehicle as a blue BMW and provided the license plate number. (RT 29:19-21) The information became a BOLO (be on the lookout). (RT 31:14-16)
>
> ***Todd Ogiba*** testified that he has been a USBP agent since 8/2007. (RT 34:5, 7) He was on duty on 5/5/21. (RT

---

[1] RT refers to the reporter's transcript from the 2/25/22 evidentiary hearing, docketed at item 51.

- 2 -

34:23-25) He arrested Defendant Anas Al Zoubani, whom he identified in the courtroom. (RT 35:3-4, 11-13) On May 5th, Agent Ogiba was assigned to Highway 80 in the Willcox station area of responsibility. (RT 35:18-19) He patrolled that route routinely once or twice a week from 4/19 until 5/5/21. (RT 36:3-4, 7-8) Highway 80 does not connect directly to the international border but it heads toward Douglas, which is near the border. (RT 37:15-19) Highway 80 connects to Interstate 10 north of the checkpoint. (RT 37:20-25) Of the three major routes in the area, Highway 80 is the most direct route from the border to I-10. (RT 38:3-6) It is a major egress route for contraband load vehicles from Naco and Douglas. (RT 56:24-25)

On 5/5/21 Agent Ogiba was driving a fully marked Border Patrol vehicle when he heard a radio announcement at about 12:10 p.m. (RT 36:11-13, 19-20) According to defense exhibit 126, the BOLO was broadcast at 12:04 p.m. The BOLO identified a blue BMW traveling northbound from the Highway 80 checkpoint. (RT 36:20-22) It included a specific Arizona license plate number. (RT 37:2) The BOLO was issued for a vehicle that was possibly transporting undocumented people and was last seen at the Highway 80 checkpoint, which was closed that day. (RT 37:5, 8-9; 57:1) The checkpoint is approximately 30 or 35 miles from the U.S.-Mexico border. (RT 37:13-14) Agent Ogiba was near Benson when he received the alert. (RT 38:11-12) He was on Highway 80 about 20 miles north of the checkpoint. (RT 38:11-19) The drive from Benson to the checkpoint takes about 15 or 20 minutes. (RT 38:23-25)

When he heard the BOLO, Agent Ogiba turned around and traveled south toward to [sic] last known location of the BMW. (RT 39:1-3) He encountered the BMW about 10 minutes later as it traveled northbound on Highway 80. (RT 39:4-11, 21-23) Defense exhibit 126 places Agent Ogiba behind the BMW at 12:13 pm, approximately nine minutes after the BOLO. The BMW had Arizona plates, but the agent was only able to see and call in the plate number after ordering the driver to return to his vehicle in the motel parking lot. (RT 39:12-13; 107:4-6) Prior to the encounter in the parking lot, the agent saw the driver and a front seat passenger in the vehicle. (RT 39:16-18) He could not see into the rear seat because the window tint was very dark. (RT 39:19-20) Agent Ogiba spotted the BMW within the time he would expect to see a

vehicle traveling from the checkpoint to that location. (RT39-40:25, 1-3) It is unusual to see luxury vehicles like BMWs in the area. (RT 40:4-6)

After Agent Ogiba saw the BMW, he made a U-turn and started following the vehicle. (RT 43:8-10) He observed the BMW accelerating and passing other vehicles. (RT 43:22-25) It is common for people transporting illegal aliens to try to create distance between themselves and law enforcement officers. (RT 44-45: 23-25, 1) The agent saw the BMW make a quick left-hand turn into the south entrance of the Sahara Motel. (RT 45:16, 22-23) He had been following the vehicle for less than five minutes, a distance of about 3.7 miles. (RT 45-46:24-25, 1, 6-7) By the time Agent Ogiba was able to slow down enough to turn into the motel parking lot, he turned into the north entrance. (RT 48:4-6) He continued to observe the blue BMW as he pulled in. (RT 50-51:25, 1-3)

The BMW pulled into a parking spot. (RT 51:6-7) The driver stayed in the vehicle until Agent Ogiba parked. (RT 52:4) About five seconds after the agent stopped, the driver got out of the BMW and started walking away. (RT 52:11-14, 17-19) The passenger remained in the vehicle. (RT 52:22-23) The driver walked in the opposite direction from the motel office. (RT 53:15-17, 22) Agent Ogiba has encountered alien smugglers who abandon their vehicles. (RT 53:12-14)

Based on the circumstances, Agent Ogiba suspected the driver was engaged in criminal activity. (RT 55:5-7) He yelled at the driver to get back in the vehicle and he activated his emergency lights. (RT 55:10-11) The driver complied. (RT 55:12-14) The agent approached the vehicle to speak with the driver. (RT 55:15-16) He identified himself as a USBP agent and questioned the occupants about their citizenship. (RT 55:18-19) The driver stated that he is a U.S. citizen. (RT 55:20-21) The front-seat passenger responded with a blank stare. (RT 55-56:25, 3-4) He was holding a Mexican voter ID card in his hand, so Agent Ogiba asked him in Spanish about his status in the United States. (RT 56:7-10) The passenger said he did not have permission to be in the country. (RT 56:9-12) Agent Ogiba arrested the driver. (RT 56:14-17)

This was the last stop and the last case Agent Ogiba had from the date of the stop until the evidentiary hearing. (RT 86:3-6, 11-13)

(Doc. 58 at 2–5.)

Defendant moved to suppress all evidence resulting from the stop described above, arguing there was no reasonable suspicion. After an evidentiary hearing on the motion, Judge Bowman issued her R&R recommending the Court deny Defendant's Motion to Suppress. (Doc. 58.) Defendant filed an Objection (Doc. 66) and the Government filed a Response (Doc. 70).

### III.  Discussion

Although Defendant does not formally object to any of the R&R's facts, he appears to take issue with the following facts:

> The checkpoint is approximately 30 or 35 miles from the U.S.-Mexico border. Agent Ogiba . . . . was on Highway 80 about 20 miles north of the checkpoint . . . . Ogiba turned around and traveled south toward to [sic] last known location of the BMW. He encountered the BMW about 10 minutes later . . . . (Doc. 58 at 3–4.)

Defendant appears to assert there is a discrepancy in this timeline because the BOLO was put out at 12:10 p.m. and the radio transmission "puts [Agent Ogiba] following a blue BMW at 12:13 p.m. just three minutes after he heard the BOLO." (Doc. 66 at 3–4.) But, because Agent Ogiba was 20 miles north of the checkpoint, "[i]t would [have] take[n] him approximately 20 minutes to drive South and reach the checkpoint." (Doc. 66 at 3–4.) Defendant also appears to take issue with Agent Ogiba's testimony that he saw a BMW ten minutes after hearing the BOLO, even though Agent Ogiba testified he is "not a car person." (*Id.*) Because these facts do not change the Court's analysis, the Court considers them immaterial for the purpose of evaluating the R&R and Objections.

In his Objection, Defendant asserts, based on the totality of the circumstances, Agent Ogiba did not have reasonable suspicion to stop Defendant because: Agent Ogiba "did not definitely confirm that the blue BMW he began following was the same car from the BOLO, and the BOLO itself adds little, if anything, to the overall reasonable suspicion calculation"; "Agent Ogiba admits he did not stop the vehicle while driving because no reasonable suspicion had yet formed"; and reasonable suspicion "did not materialize" when Defendant exited his vehicle. (Doc. 66 at 8–12.)

- 5 -

With respect to stops near an international border, the Supreme Court has identified a non-exhaustive list of factors to be considered in determining whether reasonable suspicion has coalesced: (1) the characteristics of the area where the vehicle is encountered; (2) the vehicle's proximity to the border; (3) usual traffic patterns on the particular road; (4) whether certain types of vehicles are frequently used to transport contraband or undocumented people; (5) erratic behavior on the part of the driver or attempts to evade law enforcement; (6) whether the vehicle is heavily loaded or has an unusual number of passengers; and (7) the behavior of the driver. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975). Importantly, while individual factors may appear innocent when considered in a vacuum, they may constitute suspicious behavior when considered in the aggregate. *See United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002). Further, the Supreme Court has explained courts should not engage in a "divide-and-conquer analysis," wherein each factor, viewed in isolation, may be susceptible to an innocent explanation and subsequently given no weight. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (explaining *Terry v. Ohio*, 392 U.S. 1 (1968), precludes evaluating each factor in isolation from each other because such "divide-and-conquer" analysis "does not take into account the 'totality of the circumstances'"); *see also United States v. Sokolow*, 490 U.S. 1, 9 (1989). Rather, courts must "consider[] the totality of the circumstances and give[] due weight to the factual inferences drawn by the law enforcement officer" in evaluating whether reasonable suspicion existed. *Arvizu*, 534 U.S. at 277.

First, Defendant contends the "be on the lookout" (BOLO) alert "adds little, if anything, to the overall reasonable suspicion calculations." (Doc. 66 at 9.) Further, Defendant argues Agent Ogiba's failure to confirm the BMW was in fact the vehicle described in the BOLO provided little support for finding reasonable suspicion. (*Id.*) In its Response, the Government argues: "the BOLO was properly considered under the totality of the circumstances analysis as one of several factors supporting Agent Ogiba's reasonable suspicion." (Doc. 70 at 10.)

While not a dispositive factor, a BOLO alert is given some weight in the reasonable suspicion analysis. *See United States v. Haro*, 2021 WL 6101347 at *2 (9th Cir. 2021)

("Although some of [Defendant's] conduct was 'innocent or innocuous' on its own, viewed under the totality of the circumstances, the closed checkpoint, proximity to the border, *BOLO alert*, and the agent's specific observations provided 'a particularized and objective basis' for the stop." (internal citations omitted) (emphasis added)).  Here, Agent Ogiba responded to a BOLO alert for a blue BMW and began following Defendant's blue BMW. (Doc. 58 at 4.)  The record shows Agent Ogiba weighed the BOLO as one of many present factors in his reasonable suspicion determination.

Second, Defendant focuses on the fact Agent Ogiba did not "definitively confirm" he was following the same BMW referenced in the BOLO. (Doc. 66 at 9.)  However, reasonable suspicion can be premised on a reasonable mistake of fact. *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014) ("Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law.  The officer may be reasonably mistaken on either ground.").  Therefore, even if Agent Ogiba mistook Defendant's BMW for the one referenced in the BOLO, it would not preclude a finding of reasonable suspicion.

Third, Defendant notes Agent Ogiba admitted at the evidentiary hearing held before Judge Bowman that he did not stop the BMW while driving because reasonable suspicion had not formed until Defendant parked and exited the BMW. (Doc. 66 at 10.)  Defendant suggests Defendant's behavior while driving was not suspicious (he was not speeding), the BMW did not appear to be weighted down, and there was no testimony about dangerous driving. (Id. at 10–11.)  As to the "quick" turn Defendant made into the Sahara Motel parking lot, Defendant explains Agent Ogiba did not have a clear view of the turn because there were other vehicles between Agent Ogiba and the BMW, so Agent Ogiba could not necessarily see brake lights or see the BMW slowing down for the turn. (*Id.* at 11.)

The Government asserts Agent Ogiba reasonably suspected he was following the blue BMW from the BOLO but, nonetheless, "Agent Ogiba did not stop the BMW because he prudently concluded that he should continue to observe the vehicle to build a further basis for his suspicion of criminal activity before conducting a stop." (Doc. 70 at 11.)

Fourth, Defendant argues reasonable suspicion did not materialize when he exited

his BMW and began walking away from Agent Ogiba's fully marked Border Patrol vehicle. (Doc. 66 at 11.) Defendant relies on the fact that he "did not abandon the car nor did he haphazardly park . . . [he] exited and walked away . . . [he] did not jump out of a still-running vehicle, nor did he immediately walk out." (*Id.* at 11.) Further, Defendant argues "[w]hile agents and other law enforcement individuals can rely on their training, it does not give them unbridled discretion to find reasonable suspicion when the facts and inferences do not support it." (*Id.* at 12.) Defendant further asserts: "we are missing specific factors that Agent Ogiba could point to that would transform the innocent behavior of walking away from your vehicle to 'creating distance' for purposes of reasonable suspicion." (*Id.* at 12.) In its response, the Government argues because of Agent Ogiba's knowledge of the BOLO, his training and experience with alien smuggling in the area, and Defendant's driving behavior and "abandonment of his vehicle," reasonable suspicion coalesced. (Doc. 70 at 12.)

By the time Defendant exited his vehicle in the hotel parking lot, Agent Ogiba had observed several factors weighing in favor of finding reasonable suspicion. Namely, Agent Ogiba was responding to a BOLO describing a blue BMW; shortly thereafter, he saw and followed a blue BMW that was driving along the same route the BOLO reported. The blue BMW was traveling near the international border on a common smuggling route. Agent Ogiba noticed the driver trying to create distance between himself and Agent Ogiba. And, the driver exited his vehicle and quickly walked away once parked, in the presence of Agent Ogiba's fully marked Border Patrol vehicle. While not all the *Brignoni-Ponce* factors support a finding of reasonable suspicion, a sufficient number of the factors do.

As noted in the R&R, reasonable suspicion is a low bar. *See Arvizu*, 534 U.S. at 274 (although mere "hunch" insufficient to justify stop, reasonable suspicion does not require likelihood of criminal activity rise to level of probable cause, and "it falls considerably short of satisfying a preponderance of the evidence standard" (internal citations and quotations omitted)). Here, Defendant seeks to provide an innocent explanation for each of these factors. (*See* Doc. 66.) However, because the Court must not consider the individual factors in isolation, in considering the totality of the

circumstances, the Court concludes Agent Ogiba had reasonable suspicion to stop Defendant.

Accordingly,

**IT IS ORDERED** Magistrate Judge Leslie A. Bowman's Report and Recommendation (Doc. 58) is **accepted and adopted** in its entirety.

**IT IS FURTHER ORDERED** Defendant's Motion to Suppress (Doc. 30) is **denied**.

Dated this 18th day of July, 2022.

Honorable Scott H. Rash
United States District Judge